## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

AUG – 4 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**MARK WHITNEY** )
  10118 Wateridge Circle )
  San Diego, CA 92121 )
  *Plaintiff* )
  858-452-6 Fib )
-v- )
  )
**BARACK OBAMA,** )
  President of the United States )
  1600 Pennsylvania Avenue, N.W. )
  Washington, D.C. 20500 )
  **Serve:** )
   Civil Process Clerk )
   U.S. Attorney for the District of D.C. )
   555 Fourth Street, NW )
   Washington, DC 20530 )
  **Serve:** )
   U.S. Attorney General )
   Department of Justice )
   10th & Constitution Avenue, NW )
   Washington, DC 20530 )
  **Serve:** )
   The Hon. Barack Obama )
   1600 Pennsylvania Avenue, N.W. )
   Washington, D.C. 20500, )
  )
and )
  )
**THE UNITED STATES OF AMERICA,** )
  **Serve:** )
   Civil Process Clerk )
   U.S. Attorney for the District of D.C. )
   555 Fourth Street, NW )
   Washington, DC 20530 )
  **Serve:** )
   U.S. Attorney General )
   Department of Justice )
   950 Pennsylvania Ave., NW )
   Washington, DC 20530 )
   *Defendants* )

CIVIL DKT:
JUDGE:

Case: 1:11-cv-01409
Assigned To : Roberts, Richard W.
Assign. Date : 8/4/2011
Description: TRO/PI

1

## COMPLAINT
## FOR INJUNCTIVE AND DECLARATORY RELIEF

**NOW COMES**, Mark Whitney (Plaintiff), *in propria persona*, stating the following:

### PARTIES, JURISDICTION AND VENUE

1.  Plaintiff was born in Westerly, Rhode Island and, accordingly, is a citizen of the United States, currently residing at 10118 Wateridge Circle, San Diego, CA 92121.

2.  Defendant Barack Obama (hereinafter referred to as the President) is an officer of the United States, serving at all times relevant to this matter as President, residing at 1600 Pennsylvania Avenue, N.W., Washington, D.C. 20500.

3.  The United States is a country governed by the U.S. Constitution and the laws of the United States.

4.  This lawsuit seeks a determination by the court that the President and the United States have and continue to engage in military action in Libya in violation of the U.S. Constitution and various federal statutes, including but not limited to 50 U.S.C. § 1544 (aka the War Powers Resolution).  Following such a determination, this suit requests various forms of redress by the court.  As such, this court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel an officer of the United States to perform his duty)  and 2201 (declaratory judgments).

5.  Pursuant to 28 U.S.C. § 1391(e)(1) and (e)(2)  venue is proper because a defendant herein is an officer of the United States acting in his official capacity and who resides in the District of Columbia and, separately, because a substantial part of the events giving rise to this action occurred in the District of Columbia.

## THE UNLAWFUL CONDUCT

6. The President has involved the United States Armed Forces in a civil war in Libya without the will of the People as expressed through their elected representatives in the legislature.

7. The Framers characterize "the right of Representation in the Legislature," as "inestimable." *Declaration of Independence, ¶ 5.*

8. The action seeks to compel the President, an officer of the United States, to perform a duty owed to Plaintiff pursuant to U.S. Const. Art. II, § 3, cl. 4, 50 U.S.C. § 1544(b), and otherwise. *See, 28 U.S.C. § 1361* (empowering this Court to compel an officer of the United States to perform a duty owed to the plaintiff.)

9. This action seeks to enforce 50 U.S.C. § 1544(b) -- which, effective June 19, 2011, became binding on the President -- by terminating any use of United States Armed Forces with respect to the enforcement of United Nations Resolution 1973 (2011) [1] thereby restoring Plaintiff's constitutionally guaranteed right to representation in the Congress. *See, U.S. Const. Art. II, § 2, cl. 1 and the Seventeenth Amendment.*

10. The North Atlantic Treaty Organization (NATO) has branded activities related to the enforcement of UN Resolution 1973, as *Operation Unified Protector* (OUP). [2]

11. OUP implicates "all aspects of UN Resolution 1973" and involves, *inter alia,* the degradation of Libyan leader Muammar Muhammad al-Gaddafi's military, through military operations that are "far-reaching and sustained." *See, OUP Mission Statement.* [3]

12. This Court has jurisdiction over the subject matter pursuant to:  U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 8, cl. 1; U.S. Const. art. I, § 9; U.S. Const. art. II, § 1, cl. 8; U.S.

---

[1] http://daccess-dds-ny.un.org/doc/UNDOC/GEN/N11/268/39/PDF/N1126839.pdf or http://goo.gl/ß909t
[2] http://www.jfcnaples.nato.int/Unified_Protector.aspx or http://goo.gl/P0SgC
[3] http://www.jfcnaples.nato.int/Unified_Protector/Mission.aspx or http://goo.gl/BhjlX

Const. art. II, § 3, cl. 4; U.S. Const. amend. XII; U.S. Const. amend. XXVII; The War

Powers Resolution, 50 U.S.C. § 1541, et seq; The Anti-Deficiency Act, 31 U.S.C. § 1341

13. Jurisdiction also resides in 28 U.S.C. § 1361 and 28 U.S.C. § 1651. *Brown v. Virginia,*

533 U.S. 1301 (2001) (Relief pursuant to the All Writs Act "is appropriate only if the

legal rights at issue are indisputably clear."); *Marbury v. Madison,* 5 U.S. 137, 166

(1803) ("[W]here a specific duty is assigned by law, and individual rights depend upon

the performance of that duty, it seems equally clear that the individual who considers

himself injured has a right to resort to the laws of his country for a remedy.")

14. The United States Supreme Court teaches that the "irreducible constitutional minimum of

standing" contains three elements: (1) injury-in-fact; (2) causation; and (3) redressability.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

15. The President's interference with Plaintiff's constitutionally guaranteed right to

representation in the Congress with respect to the situation in Libya, constitutes an

irreparable injury that is redressable by enforcing 50 U.S.C. § 1544(b).

16. The President's and United States' unlawful, and unauthorized military action in and

concerning Libya, as detailed in this complaint, imposes immediate, irreparable injury,

loss and/or damage to the Plaintiff by, among other things, (i) depriving Plaintiff of his

Constitutional right to representation (in that only his representative and the

representatives of the citizens of the United States -- i.e., the members of Congress --  can

authorize the military action at issue); (ii)  endangering and causing the loss of life of

Plaintiff's fellow U.S. citizens; (iii) endangering and causing the loss of life of U.S.

soldiers whose purpose is to be available to engage in lawful military operations on

behalf of the citizens of the United States; (iv) endangering and causing the loss of life of

foreigners, with whom Plaintiff, as a member of the worldwide human race, is entitled to have the opportunity and potential to relate, "kinetically" and otherwise; (v) spending money that is then unavailable for important, lawfully authorized governmental functions, such as helping to remedy important societal issues that the government is tasked to address such as the economy and social justice.

17. This Court is empowered to issue injunctive and declaratory relief pursuant to 28 U.S.C. §§ 1361, 1651, 2201, 2202 and 42 U.S.C. § 1983.

18. The relevant actions and inactions of the two political branches are fully developed and the President continues to fully enforce -- contrary to law -- the uncodified administrative policy complained of below, rendering this matter ripe for judicial review.

## FACTS AND ARGUMENT

"It is too true, however disgraceful it may be to human nature, that nations in general will make war whenever they have a prospect of getting anything by it; nay, absolute monarchs will often make war when their nations are to get nothing by it, but for the purposes and objects merely personal, such as thirst for military glory, revenge for personal affronts, ambition, or private compacts to aggrandize or support their particular families or partisans. These and a variety of other motives, which affect only the mind of the sovereign, often lead him to engage in wars not sanctified by justice or the **voice or interests of his people**."

*Federalist No. 4 by John Jay, 1ˢᵗ Chief Justice of the Supreme Court. (emphasis added)*

19. Congress makes laws.

20. The presidency is 100% a creature of the Constitution, which is the source if its powers and *limitations*.

21. The President does not decide "what the law is." *cf. Marbury v. Madison*, 5 U.S. 137, 177 (1803). ("It is emphatically the province and duty of the judicial department to say what the law is.")

22. In the United States the President is accountable to the People.

23. Plaintiff's legal relationship with the President is conceptually distinct from his legal relationship with the Congress.

24. The Framers characterize "the right of Representation in the Legislature." as "inestimable." *Declaration of Independence.* ¶ 5.

25. James Madison referred to the House of Representatives as "that branch of the federal government which ought to be dependent on the people **alone**." *Federalist No. 52 (1788). (emphasis added).*

26. U.S. Const. Art. II, § 2, cl. 1 and the Seventeenth Amendment, secure the People's right to representation in the Congress.

27. As a matter of relevant constitutional law, the People's primary hope for meaningful political influence, resides, first and foremost, in the bicameral legislature, in the form of a single representative and two senators, all of whom are elected by popular vote.

28. The People do not elect the President.

29. Per the Twelfth Amendment and 3 U.S.C. § 1, et seq., the President was elected by "Electors." The People's vote was *not* legally binding for purposes of electing the President, as it was for purposes of electing the Congress.

30. The People's contract with the Congress. depends, in relevant part, on the President's faithful performance of certain duties assigned by law.

31. As required by Art. II, § 1, cl. 8 "[b]efore he enter[ed] on the Execution of his Office," Barack Obama solemnly affirmed that he would "preserve, protect and defend the Constitution of the United States," whereupon, as a matter of law and pursuant to U.S. Const. Art. II, § 3, cl. 4, the new President instantly incurred a fiduciary duty to Plaintiff to "take Care that the Laws be faithfully executed."

32. One of "the Laws" is 50 U.S.C. § 1544(b).

33. On March 19, 2011, the President directed the United States Armed Forces to participate in a civil war in the nation of Libya.

34. For additional factual background surrounding the situation in Libya, Plaintiff incorporates herein by reference, the facts alleged in the June 15, 2011 report provided to the House of Representatives by the Department of State and the Department of Defense, respectively. *See, United States Activities in Libya*, (hereinafter "Report");[1] *also, S.J. RES 20 112th Congress, pp. 1-4 (2011).*[5]

35. The Report at page 7 references the following testimony of Secretary of State Hillary Clinton:

> "The stakes are high. And this is an unfolding example of using the combined assets of diplomacy, development and defense to protect our **interests** and advance our **values**." *(emphasis added).*

36. The Report at page 25 states the following in relevant part:

> "The President is of the view that the current U.S. military operations in Libya are consistent with the War Powers Resolution and do not under that law require further congressional authorization, because U.S. military operations are distinct from the kind of 'hostilities' contemplated by the Resolution's 60 day termination

---

[1] http://www.thelaw.net/20110615_united_states_activities-in_libya.pdf or http://goo.gl/zfk1B
[5] http://www.thelaw.net/appendix/SJRes20_Authorizing_Libya_NATO_Mission.pdf or http://goo.gl/Dmaa1

provision."

37. The President's foregoing statement has been openly mocked by Republicans and Democrats in the Congress.[6]

38. Significantly, the Presidential directive to involve United States Armed Forces in the civil war in Libya, was not issued in response to a national emergency, an attack, an act of Congress,[7] or pursuant to Public Law 107-40. *See, Authorization To Use Military Force, S.J. RES 23. (aka, The War On Terror).*[8]

39. Instead, the President's decision was made in furtherance of UN Resolution 1973, together with his existing, ongoing, uncodified administrative policy that claims to advance the so-called "universal rights" of selected individuals in certain countries, including Libya, Bahrain,[9] Syria,[10] Tunisia,[11] Yemen,[12] Egypt,[13] and Iran.[14]

---

[6] http://www.cbsnews.com/stories/2011/06/16/ap/politics/main20071855.shtml or http://goo.gl/Lxw8N

[7] cf. 50 U.S.C. § 1541(c)(3)· **"Presidential executive power as Commander-in-Chief; limitation** The constitutional powers of the President as Commander-in Chief to introduce United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, **are exercised only** pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces." *(emphasis added)*

[8] http://www.gpo.gov/fdsys/pkg/PLAW-107publ40/pdf/PLAW-107publ40.pdf or http://goo.gl/FwwkR

[9] http://m.whitehouse.gov/blog/2011/03/18/president-libya-our-goal-focused-our-cause-just-and-our-coalition-strong or http://goo.gl/VJcw5

[10] http://m.whitehouse.gov/blog/2011/04/22/statement-president-obama-syria or http://goo.gl/UWvwU

[11] http://www.whitehouse.gov/the-press-office/2011/01/14/statement-president-events-tunisia or http://goo.gl/pHnfM

[12] http://m.whitehouse.gov/the-press-office/2011/02/18/press-gaggle-press-secretary-jay-carney-aboard-air-force-one-en-route-po or http://goo.gl/d8o1f

[13] http://m.whitehouse.gov/the-press-office/2011/02/10/statement-president-barack-obama-egypt or http://goo.gl/Y6Fkp

[14] http://m.whitehouse.gov/the-press-office/2011/04/12/statement-press-secretary-eu-designation-iranian-human-rights-abusers or http://goo.gl/lZPo9

40. In a March 28, 2011 address to the nation, the President described the civil war on Libya as one of the "times . . . when our safety is not directly threatened, but our **interests** and our **values** are." *(emphasis added).*[15]

41. Title 50 U.S.C. § 1544(b), which mandates, in relevant part, that "the President shall terminate any use of United States Armed Forces" with regard to Libya, became judicially enforceable on June 19, 2011.

42. That same day, the Department of Defense released an official statement summarizing a recent interview of then-Secretary of Defense Robert Gates by Fox News' Chris Wallace:

> "The secretary believes President Obama has complied with the War Powers Act. But the president would also welcome the Congress passing a resolution of support. From the U.S. standpoint American service members are 'involved in a limited kinetic operation. If I'm in Qaddafi's palace, I suspect I'd think I'm at war."[16]

43. Plaintiff asks the Court to take judicial notice that to the extent every military operation ends, all such operations are, by definition, "limited." The Vietnam War, for example, started on November 1, 1955 and ended on April 20, 1975. It was, accordingly, "limited" to 19 years, 180 days.

44. According to the Libyan Ministry of Health, the first 100 days of this purported non-hostile, limited kinetic operation, resulted in 6,121 killed or injured individuals.[17]

45. The Report on United States Activities in Libya states:

---

[15] http://www.whitehouse.gov/the_press_office/2011/03/28/remarks_president_address_nation_libya or http://goo.gl/RAH1U
[16] http://www.defense.gov/news/newsarticle.aspx?id=64373 or http://goo.gl/lym5V
[17] Specifically, 3093 injured men, 668 murdered men, 1318 injured women, 260 slaughtered women, 641 injured children and 141 incinerated kids. *See, generally, specifically and otherwise, public documents available at the official site of* **NATO OPERATION UNIFIED PROTECTOR.** http://www.jfcnaples.nato.int/Unified_Protector.aspx or http://goo.gl/P0SgC

"The United States is providing unique assets and capabilities that other NATO and coalition nations either do not possess or possess in very limited numbers such as suppression of enemy air defense (SEAD); unmanned aerial systems; aerial refueling; and intelligence, surveillance, and reconnaissance (ISR) support."[18]

46. What the Report materially omits, is the fact that OUP aerial operations are conducted under the direct command of Lieutenant General Ralph J. Jodice II, an officer in the United States Air Force (Jodice)[19] and the ultimate command of Admiral James G. Stavridis, an officer in the United States Navy (Stavridis)[20].

47. At a recent meeting of NATO's Atlantic Council, Admiral Stavridis stated of the 130,000 military men and women under his command, "We're very good at launching missiles."[21]

48. Proving the truth of his commanding officer's statement, and according to public documents made available by NATO, on May 13, 2011, Jodice delivered a so-called "precision strike" consisting of two MK 82 bombs to a peace delegation of religious leaders, instantly killing 11 and injuring 14.

49. During the early morning of June 20, 2011, Jodice delivered eight missiles and bombs to the home of Khaled Al-Hamedi and his parents and family. Fifteen family members and friends were killed including Khaled's pregnant wife, his sister and three of his children.

50. In late June, 2011 on the main road west of Tripoli, Jodice presided over the TOW missile bombing of a public bus, killing all 12 non-combatant passengers.

---

[18] http://www.thelaw.net/20110615_united_states-activities-in-libya.pdf (p.14) or http://goo.gl/zfk1B
[19] Lt Gen. Ralph J. Jodice II is Commander, Allied Air Component Command Headquarters Izmir, Turkey, and Commander, 16th Air Expeditionary Task Force, U.S. Air Forces in Europe, Izmir, Turkey. Allied Air Command Izmir is subordinate to Allied Joint Force Command Naples and is solely responsible for command and control, oversight, planning, coordination and execution of all air related tasks in NATO's Southern Region.
[20] Admiral James Stavridis assumed duties as Commander of European Command and as Supreme Allied Commander, Europe in early summer 2009.
[21] http://www.aco.nato.int/page30040449.aspx or http://goo.gl/Dwzw0

51. On June 6, 2011, at 2:30 a.m., Jodice delivered 12 bombs and rockets to the Higher Committee for Children in central Tripoli. The complex housed the National Down Syndrome Center including its records and vital statistics office, the Crippled Women's Foundation, the Crippled Children Center, and the National Diabetic Research Center.

52. On June 16, 2011 at 5 a.m. Jodice bombed a private hotel in central Tripoli, killing three and destroying a restaurant and Shisha smoking bar.

53. Martial law has been imposed on Libyan airspace under the direct command of United States military officers.

54. A *July* 19, 2011 official press briefing revealed that forces under Jodice's direct command, have engaged more than 3,000 targets, including 350 radar systems, various surface to air missile sites and related storage facilities, 190 command and control facilities, and 850 munitions facilities.[22]

55. In addition to deploying bombs, the President has deployed a lot of high-minded rhetoric as justification for his offensive military operation. Congress, however, has yet to pass a law distinguishing "the good guys" from "the bad guys" with respect to the muddled situation in Libya.

56. In the absence of such specific statutory definition, from the People's perspective, any deaths or injuries befalling inhabitants of Libya are arbitrary, *per se*.

57. As a United States Senator in 2007, then-presidential candidate, Barack Obama, orally republished the intent of 50 U.S.C. § 1541(c)(3) when he correctly stated the following to the Boston Globe:

---

[22] http://www.nato.int/cps/en/SID-DEDE7847-742A7BE0/natolive/opinions_76568.htm or http://goo.gl/EZ!gc

"The president does not have power under the Constitution to unilaterally authorize a military attack in a situation that does not involve stopping an actual or imminent threat to the nation."[23]

58. Unfortunately, as President, Mr. Obama not only authorized attacks that contravene the forgoing statute, he has steadfastly refused to acknowledge that such attacks amount to "hostilities" under the 1973 War Powers Resolution, which by reference incorporates U.S. Const. Art. I. § 8. cl. 11. which states:

"The Congress shall have Power to declare war."

59. The President's refusal has since been repudiated by Caroline Krass, the Principal Deputy Assistant Attorney General of the United States Department of Justice's Office of Legal Counsel and the Senate Committee on Foreign Relations, respectively.

"It has now been over three months since the first NATO bombs fell on Libya, yet President Obama has failed to request Congressional approval for military action, as required by the War Powers Act of 1973. The legal machinations Mr. Obama has used to justify war without Congressional consent set a troubling precedent that could allow future administrations to wage war at their convenience — free of legislative checks and balances....**Caroline D. Krass, acting head of the Office of Legal Counsel, told the president that he had to abide by the act's requirements**, the White House counsel decided to pre-empt the Justice Department's traditional role."

*Legal Acrobatics, Illegal War* by Bruce Ackerman, Yale Professor of Law and Political Science, New York Times, 2011.06.21. *(emphasis added)*[24]

"United States military operations in Libya since April 4, 2011, which have included non-kinetic support to the NATO-led operations, including intelligence,

---

[23] http://articles.boston.com/2011-06-27/news/29709629_1_libya-campaign-senator-obama-president-obama or http://goo.gl/LDN1d

[24] http://www.nytimes.com/2011/06/21/opinion/21Ackerman.html or http://goo.gl/zWOiq

logistical support, and search and rescue assistance, United States aircraft assisting in the suppression and destruction of air defenses in support of the no-fly zone, and precision strikes by unmanned aerial vehicles, constitute hostilities within the meaning of the War Powers Resolution, and may be carried out only under the conditions specified in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))."

*S.J. Res. 20* [25]

60. On June 28, 2011, the President's handpicked legal representative, Harold Hongju Koh, Esq., appeared before the Senate Committee on Foreign Relations, testifying with regard to Libya, that "the most urgent question now facing us, [] is not one of law but of *policy*." *(emphasis added)* [26]

61. On June 29, 2011, in a televised press conference, and in response to Chuck Todd's question regarding the involvement of United States Armed Forces in the civil war in Libya, the President stated:

"I don't even have to get to the constitutional question." [27]

62. Article I, § 9 of the United States Constitution states that "No money shall be drawn from the Treasury, but in consequence of appropriations made by law."

63. Various attempts to secure funding for United States Armed Forces participation in the civil war in Libya have all failed.

64. As a matter of policy, the President's maladministration of his undeclared war is made possible by funds previously appropriated for legitimate, alternative purposes.

65. The Anti-Deficiency Act states, in relevant part:

---

[25] http://www.thelaw.net/appendix/SJRes20_Authorizing_Libya_NATO_Mission.pdf or http://goo.gl/DmaaT
[26] http://www.cfr.org/libya/kohs-testimony-libya-war-powers-june-2011/p25401?cid=rss-africa-koh_s_testimony_on_libya_and_w-062811 or http://goo.gl/LHb6Y
[27] http://www.whitehouse.gov/the-press-office/2011/06/29/press-conference-president or http://goo.gl/cH7UO

> "(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not – (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or] (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

*31 U.S.C. § 1341 (2003) (formerly 31 U.S.C. § 665(a) (1950)).*

66. On July 8, 2011, the House of Representatives expressly appropriated $118 billion in spending for so-called "overseas contingency operations," while expressly ***banning*** the allocation of any monies with respect to the civil war in Libya:

> "**SEC. 10003.** None of the funds made available by this Act may be used by the Department of Defense to furnish military equipment, military training or advice, or other support for military activities, to any group or individual, not part of a country's armed forces, for the purpose of assisting that group or individual in carrying out military activities in or against Libya."

*H.R 2219: The Department of Defense Appropriations Act, 2012.*[28]

67. United States Armed Forces are actively involved in a civil war in Libya under the direct command of an officer of the United States Navy, an officer of the United States Air Force, and the President of the United States, respectively.

68. Such ongoing, active involvement violates the plain terms of 50 U.S.C. § 1544(b) which mandates, in relevant part, that "the President shall terminate any use of United States Armed Forces[.]"

69. With respect to the situation in Libya, the President's violation of § 1544(b), and otherwise, deprives Plaintiff and the People of their constitutionally guaranteed legal relationship with the Congress.

---

[28] http://www.gpo.gov/fdsys/pkg/BILLS-112hr2219eh/pdf/BILLS-112hr2219eh.pdf or http://goo.gl/YnRXI

70. In the absence of a national emergency caused by an attack, specific statutory legislation is required as a condition precedent to United States Armed Forces continued participation in the Libyan civil war.[29]

71. At this writing the President has been in of § 1544(b) for a 1-1/2 months; a violation that cannot be waived by congressional inaction.

72. It is axiomatic that the President lacks discretion to permit United States Armed Forces to continue to participate in the civil war in Libya.

73. Stavridis, Jodice and their subordinates in the United States military, are actively engaged in OUP in flagrant violation of United States law.

74. The law of the land, as declared by the United States Supreme Court, has been clear for 150 years:

- "Congress alone has the power to declare a national or foreign war....[The President] has no power to initiate or declare a war either against a foreign nation or a domestic State." *Prize Cases,* 67 U.S. 635, 668 (1862).

- "It has become popular to think the President has the power to declare war. But there is not a word in the Constitution that grants that power to him. It runs only to Congress." *Holtzman v. Schlesinger,* 414 U.S. 1316, 1317 (1973).

- Only the Congress is imbued with "express authority" to declare war. *Am. Ins Ass'n v. Garamendi,* 539 U.S. 396, 414 (2003).[30]

75. By way of comparison, Plaintiff briefly directs the Court's attention to three recent scholarly writings:

- On May 20, 2011, the Wall Street Journal published a piece by former Justice Department Office of Legal Counsel official, John Yoo, who – not surprisingly suggested that Presidents are free to "declare the War Powers Resolution an

---

[29] Under the circumstances, it is doubtful the President even had jurisdiction over the subject matter to unilaterally order such participation in the first place. cf. 50 U.S.C. § 1541(c)(3).

[30] The legions of judicial opinions referring, in various terms, to the inherent collaborative nature of constitutional warmaking between the two political branches are not inapposite.

unconstitutional infringement on presidential power."[31]

- On June 29, 2011, in a piece called *Bomb Away, Mr. President*, Yale Professor Akhil Reed Amar, stated that the President is free to thumb his nose at the Constitution and the War Powers Resolution pursuant to something "lawyers call Federal common law."[32]

- On May 17, 2011, even Reed's Yale colleague, Bruce Ackerman, wrote in *Death Of The War Powers Act* for *The Washington Post*, that "[i]f nothing happens, history will say that the War Powers Act was condemned to a quiet death by a president who had solemnly pledged, on the campaign trail, to put an end to indiscriminate warmaking."[33]

76. In light of the short shrift paid, by the three foregoing legal scholars, to enduring principles of equal protection and separation of powers, is it any wonder that the *2010 National Report Card*, as compiled by the United States Department of Education, reveals that only 7% of the nation's eighth graders can identify the three branches of Government? [34]

77. Plaintiff respectfully and humbly suggests it is past time for a national lesson in *applied* civics.

78. In Plaintiff's opinion, due to the lack of vital United States interests in Libya, and in the absence of a national emergency created by an attack, United States Armed Forces should not be involved in the civil war in Libya, because such forces are already actively involved in Afghanistan and Iraq, at a time when the United States national debt exceeds $14 trillion, excluding the $75 trillion owed for Medicare, Medicaid, Social Security and various programs related to the bailout of the financial sector.

---

[31] http://online.wsj.com/article/SB10001424052748703509104576327220508314168.html or http://goo.gl/OU7Gu
[32] http://www.slate.com/id/2298089/ or http://goo.gl/SL0hK
[33] http://www.washingtonpost.com/opinions/death-of-the-war-powers-act/2011/05/17/AF3Jh35G_story.html or http://goo.gl/GlMDH
[34] http://nces.ed.gov/nationsreportcard/civics/ or http://goo.gl/OzB2H

79. Plaintiff further believes that it is in the national interest to send a message to the world that United States Armed Forces cannot be counted upon to participate in discretionary foreign civil wars, until and unless, the will of the People is expressed accordingly via specific authorizing legislation.

80. Plaintiff is not alone in his view; between two-thirds and three-quarters of the People -- depending on which poll one reads -- tell pollsters they would rather not see United States Armed Forces "involved" in Libya.[35]

81. Plaintiff believes this is why Congress has repeatedly refused to ratify the President's misconduct.

82. When it comes to the situation in Libya, the will of the People, as appropriately and accurately reflected by congressional *inaction*, has been thwarted by presidential shenanigans, leaving them with nothing but the prayer of a judicial check.

83. When a President pulls a stunt like this, the walls of power separation collapse.

   - The People are boxed out of the conversation.
   - In light of the President's veto power, it is all but procedurally impossible -- short of impeachment -- for Congress to unring the bell.[36]
   - The power of the People to reward or punish members of the Congress at the ballot box -- on a grave question of war -- is displaced because § 1544(b) liability does not implicate the Congress.

84. Only a sitting President can violate § 1544(b) and Art. I, § 8, cl. 11.

---

[35] http://www.pollingreport.com/libya.htm or http://goo.gl/NdJNi

[36] "'Take recent events in Libya. The president didn't try very hard to get Congress to agree to the intervention, some say, because he didn't think he had the votes. Congress, for its part, has been unwilling or unable to defend its constitutional and statutory power to authorize a war. In a single day, the House voted down a resolution that would have approved the war and then, just hours later, voted down a bill that would have denied the president the power to spend any new money on the war. Not surprisingly, **the war continues without a single Congressional vote to support it, and Congress's power to authorize military action has taken a hit from which it may never recover.**'" *Our Unbalanced Democracy*, New York Times lead editorial, July 31, 2011. (emphasis added) http://www.nytimes.com/2011/08/01/opinion/our_unbalanced-democracy.html or http://goo.gl/3WuYz

85. In 2003, the United States Court of Appeals for the First Circuit contemplated the "extreme case" whereby Congress gives "absolute discretion to the President to start a war at his or her will." *Doe v. Bush,* 323 F.3d 133, 143 (1st Cir. 2003).

86. Even that hypothetical "extreme" assumed an act of Congress.

87. In the instant case, Congress has not acted. Rather, is has stubbornly retained its claim on Art. I, § 8, cl. 11, by repeatedly and consistently refusing to act.

88. The President unilaterally involved United States Armed Forces in a protracted foreign civil war, with regime change as the objective, and he did it without first obtaining the will of the People as expressed through their elected representatives in the Congress.

89. In so doing, the President arbitrarily subordinated Plaintiff's constitutional right to representation in the Congress, to the so-called "universal rights" of certain individual participants in a foreign civil war.

90. Such subordination continues in violation of § 1544(b), and otherwise, which is barely surprising, considering the forthright testimony of Attorney Koh, who succinctly and aptly described the totality of circumstances giving rise to the filing of this complaint as one of policy over law.

91. This Court should set its face against the implied notions advanced by the President, that discretionary, aggressive, violent, offensive military operations are legally indistinguishable from unavoidable defensive measures, and that the enduring constitutional definition of "War" can be jury-rigged by simply merging the mode of bomb deployment, together with tortured wordplay, sophomoric gamesmanship and faux legal jargon.

92. Advanced technology may have the ability to reduce, eliminate or delay the need for so-called "boots on the ground," but it does not amend the Constitution, magically transferring power from the People's deliberative legislature, to shoot-first, defend-it-later, "experts" in the executive branch.

93. That said, to the extent such technology ensures that American lives are not at risk, the need for judicial restraint with respect to the situation in Libya, is one less thing for this Court to worry about.

> "U.S. operations do not involve...the presence of U.S. ground troops, U.S. casualties or a serious threat thereof[.]"[37]

94. The People -- through the action and inaction of their collective elected representatives -- have answered the President's call to arms, and the answer is, "No."

95. The President has turned a deaf ear, responding with terms like "universal rights," "interests" and "values."

96. Should the President's uncodified, "universal rights" policy enforcement action be allowed to stand as implemented, future Presidents will have a freehand to simply utter magic words like "interests" and "values," as the sole condition precedent to unilaterally involving United States Armed Forces in foreign civil wars, that at the outset seemed just oh, so "limited."

97. Imagine plenary War Power in the hands of a President who resolves constitutional questions concerning religion *against* the Ten Amendments, and in favor of the Ten Commandments. With all due respect to Secretary Clinton, such are the enduring, legitimate "interests" and "values" at stake.

---

[37] http://www.thelaw.net/20110615-united-states-activities-in-libya.pdf   (p.27) or http://goo.gl/zfk1B

> "Decency, security and liberty alike demand that government officials shall be subjected to the rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously."

*United States v. Olmstead,* 277 U.S. 438, 485 (1928).

98. To cite Alexander DeConde's, *Presidential Machismo: Executive Authority, Military Intervention and Foreign Relations,* quoting, with approval, the language of Arthur M. Schlesinger, Jr.:

> *"The country could benefit*
> *from 'a little serious disrespect*
> *for the office of the Presidency.'"*

## REQUEST FOR RELIEF

**NOW THEREFORE,** the Plaintiff seeks:

**(i)** a determination that the United States and the President -- through their authorizing and conducting the above-described military activity in connection with Libya -- have not honored their duty to Plaintiff and the People, by faithfully executing 50 U.S.C. § 1544(b) as required by U.S. Const. Art. II, § 3, cl. 4 and otherwise, and have violated and are continuing to violate said statute and the United States Constitution;

**(ii)** an order (in the form of mandamus, injunction, writ, or otherwise) directing the President and the United States to immediately terminate any use of United States Armed Forces with respect to the situation in Libya, thereby redressing injury to Plaintiff, including, but not limited to, restoring his legal relationship with the Congress, as such relationship existed prior to Defendants' interference;

**(iii)** such further relief as to the Court may seem just and proper.

Respectfully submitted,

August 4, 2011

Mark Whitney
10118 Wateridge Circle 104
San Diego, CA 92121
858.452.6796
mwhitney@thelaw.net